[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter arises out of a contract whereby the plaintiffs CT Page 3758 agreed to pay Stewart Development Corporation (hereinafter Stewart) $215,700.00 to construct a home for them at 32 Westport Drive, Waterbury, Connecticut. It should be noted here that Stewart Development Corporation is not a defendant in this action. The subject contract was signed (Exhibit B) on August 23, 1987, by the plaintiffs and Stewart Development Corporation. At the signing of the contract, the plaintiffs paid the sum of $21,570.00 to Stewart Development Corporation, as evidenced by Exhibits F1 and F2. The defendants are Daniel C. Settani dba Daniel Settani Associates and Coldwell Banker Daniel Settani Associates (hereinafter Settani) and Ann Palladino Ouellette (hereinafter Ouellette). Settani was the real estate broker which had the exclusive listing for all of Stewart's homes in the development known as Peach Orchard Estates Subdivision #4. The defendant Ouellette was a real estate agent who testified she was an independent contractor and not an employee of the defendant Settani. The plaintiffs, Doctor Michael J. Ackley and Joan Ackley, are husband and wife, and the plaintiff, Muriel G. Flathmann and Edward H. Flathmann, are the parents of Joan Ackley.
The plaintiffs decided that they were going to have a new home constructed for them with what is commonly known as an "in-law apartment." Thus, the plaintiffs contracted with Stewart to build such a home for them for $215,700.00. Anthony Stewart, the President of Stewart Development Corporation, testified that the plaintiffs chose a basic Colonial model which cost $186,000.00 to construct and to which they wanted a 1,000 to 1,100 square foot in-law apartment added. The addition of this in-law apartment cost $29,700.00, for a total price of $215,700.00, according to Mr. Stewart.
The original contract was given to the plaintiff, Doctor Ackley, on or about August 11, 1987, by Ann Ouellette, so that the plaintiffs' attorney could review it. As a result, Amendment No. 1 (Exhibit B2) was added to the basic contract. Then, a document hand written by Doctor Ackley (Exhibit B3) was also added to the contract. Thus, the complete contract consisted of three parts, the base contract, the Amendment and the hand written document.
On August 22, 1987, all four plaintiffs, Anthony T. Stewart and Ann Ouellette met at the office of the Stewart Development Corporation, and reviewed the subject contract line by line. According to the testimony, most, if not all, of the negotiations on that day were between Doctor Ackley and Mr. Stewart. This meeting took approximately two and one-half (2-1/2) to three (3) CT Page 3759 hours. The defendant, Settani, never appeared for trial, but was represented by counsel. During construction of this home, the plaintiff, Doctor Ackley, was on the site daily according to the testimony.
According to paragraph #12 of the contract, Stewart estimated the plaintiffs' new home would be ready for occupancy on or about December 1, 1987. Doctor Ackley testified that the plaintiffs moved into the house in September 1988, when a permanent Certificate of Occupancy was obtained. However, at that time, the plaintiffs did not pay for said home because clear title could not be obtained due to the liens on said property. In November 1988, a bank started foreclosure proceedings against this development, including the plaintiffs' home. Prior to this time, while the plaintiffs had not paid for said home, they had expended over $6,000.00 for various items in said home. They also instituted a lawsuit for specific performance against Stewart Development Corporation in the Waterbury Superior Court. The legal fees paid by the plaintiffs in that matter were $10,000.00. Doctor Ackley testified that he believed the purpose of this lawsuit was to allow the plaintiffs to remain in their home, irrespective of what happened in the foreclosure matter. He also stated that in the foreclosure proceedings, the plaintiffs' home was separated from the remaining property being foreclosed. At the time, the plaintiffs took occupancy of the subject premises, there were substantial liens on this project. When the plaintiffs purchased said home on or about November 19, 1989, they paid $184,900.00 for it (Exhibit 3). The plaintiffs purchased the home at an auction which was held relative to the foreclosure proceedings against the premises.
In this action, the plaintiffs are suing for the return of their deposit of $21,570.00, plus interest, attorneys fees, punitive damages and costs. The plaintiffs' Amended Complaint, dated August 19, 1992, is in two counts, one for Breach of Contract and the second count for a violation of Connecticut's Unfair Trade Practices Act (CUTPA), Connecticut General Statutes 42-110b. The defendants have filed an answer to the complaint and also three special defenses.
Paragraph Three of the Sales Contract (Exhibit B1) reads in part as follows:
TOTAL PURCHASE PRICE: $215,700.00 CT Page 3760
 In addition to the payment of the Purchase Price in the manner above-described, the Buyer shall be obligated to pay for any additions or changes to the Specifications set forth in Schedule C attached hereto which are accomplished at time of execution of this Agreement simultaneously with the execution of this Agreement in the form of a bank or certified check payable to the order of Seller for the required amount.
 All monies paid on account hereunder by the Buyer shall be held in escrow by the Seller's attorneys, Schatz Schatz, Ribicoff Kotkin, One Landmark Square, Stamford, Connecticut, until such time as the Mortgage Contingency set forth in Paragraph 4 hereof is of no further force and effect or until such time as this Agreement has been terminated, as the case may be.
Mr. Stewart and the defendants interpret that clause to mean that as soon as the Buyer obtains mortgage financing and the mortgage contingency is met, then the Sellers' attorney could release the deposit monies to the contractor. Doctor Ackley testified that the plaintiffs already had their mortgage financing in place when they signed this contract.
Paragraph #2 of Amendment #1 amends the aforementioned provision as follows:
 2. Paragraph 3 is amended so that purchase price shall be Two Hundred Fifteen Thousand ($215,000) Dollars, of which Twenty One Thousand Five Hundred ($21,500) Dollars is payable at the execution of this Amendment No. 1, to be held by Schatz Schatz, Ribicoff 
Kotkin and applied (with the interest thereon) against the purchase price at the Closing, and One Hundred Ninety Three Thousand Five Hundred ($193,000) [sic] Dollars shall be payable at the Closing. Should we not close on this house through the fault of Stewart Development, interest on down payment will be paid at current money market rates. CT Page 3761
This provision clearly states that the deposit should be held by the Seller's attorney until such time as the closing or transfer of the title takes place. At the meeting of August 22, 1987, the plaintiffs made out the deposit checks to Stewart Development Corporation totalling $21,570.00 (Exhibits F1 and F2). Doctor Ackley testified that the defendant, Ann Ouellette, told him and Edward H. Flathman how to make out these checks. Ms. Ouellette does not recall Doctor Ackley asking how to make out the deposit checks. Ms. Ouellette testified she does not remember any negotiations on paragraph #2 of Amendment #1, but she stated that may be due to the fact that she was there (at the meeting of August 22, 1987) so long, that she was not paying attention. Mr. Stewart testified that all conversations between he and Doctor Ackley prior to August 22, 1987 were to the effect that the deposit check was going to be turned over to Stewart Development Corporation and that it would spend said monies when they were received. When asked about paragraph #2 of Amendment #1, he stated he possibly did not understand it. This, the court finds hard to believe. Mr. Stewart testified it was made clear to Doctor Ackley that the deposit money would be turned over to him because this money was for the change in the plans and that anytime changes were made, the cost of that change had to be paid for in advance. In other words, the "in-law apartment" cost $29,700.00, and the checks totalling $21,570.00 were credited to that amount. He claimed the plaintiffs owed $18,600.00 as a deposit on a home costing $186,000.00 and $29,700.00 as payment for the "in-law apartment" or $48,300.00. However, the plaintiffs did not have that amount available, according to the defendant, Ann Ouellete, so Stewart Development Corporation accepted $21,570.00. However, the court notes that $21,570.00 is exactly 10% of the total purchase price of $215,700.00.
The plaintiffs never received credit for their deposit of $21,570.00 as Stewart Development Corporation spent said monies before the foreclosure proceedings were instituted against it. The plaintiffs testified that it was the defendant's responsibility to see that the deposit monies were held in escrow by the attorneys for Stewart. However, the checks were made out to Stewart Development Corporation and Anthony Stewart testified that he or an employee of Stewart received the checks at the signing of the contract on August 22, 1987.
As to the first count, the court finds the issues for the defendants. The defendants had no contract with the plaintiffs. CT Page 3762 The contract in this matter was between the plaintiffs and Stewart Development Corporation. The subject deposit checks were made out to Stewart Development Corporation, not the defendants. Doctor Ackley testified that he thought Schatz, Schatz, Ribicoff Kotkin had an account for Stewart Development Corporation and that that is why the checks were so drawn. However, the contract and the Amendment thereto both stated the deposit check was to be made out to Schatz, Schatz, Ribicoff Kotkin, Trustee. The court cannot understand why the checks were not drawn as set forth in the contract or why the contract was not amended to reflect the manner in which the checks were drawn. The defendant, Ann Ouellette, testified that in 1987, she always told clients that she worked for the Seller. In another part of her testimony, she stated in 1987, she represented Sellers and Buyers. The existence of an agency relationship is a question of fact. Beckenstein v. Potter Carrier, Inc., 191 Conn. 120, 133. The burden of proving agency is on the plaintiff. Felsted v. Kennedy Auto Services, Inc., 25 Conn. App. 665,671. It must be proven by a fair preponderance of the evidence. Botticello v. Stefanowicz, 177 Conn. 22, 26. In this matter, the plaintiffs have not proven by a fair preponderance of the evidence that the defendants were their agent relative to the checks for $21,570.00, or for any other purpose at issue in this lawsuit.
There was evidence presented relative to the second count in the complaint. However, the plaintiffs did not sustain their burden of proof by a fair preponderance of the evidence on this count and therefore, the court finds the issues for the defendants on this count, also.
Judgment may enter accordingly.
William J. Sullivan, J.